# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## NO. 2022 CA 1160

RONNIE ROY MARSHALL

VERSUS

CHARLES FRANKLIN AND MILTON MARSHALL

Judgment Rendered: __JUN 1 4 2023__

* * * * *

On Appeal from the
City Court of East St. Tammany
In and for the Parish of St. Tammany
State of Louisiana
Trial Court No. 20193674

Honorable Bryan D. Haggerty, Judge Presiding

* * * * *

Jane L. Triola
Pearl River, LA

Attorney for Plaintiff-Appellee,
Ronnie Roy Marshall


Richard A. Richardson
Covington, LA

Attorney for Defendant-Appellee,
Milton Marshall


Richard A. Richardson
Covington, LA

Attorney for Defendant-Appellant,
Charles Franklin


* * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**HESTER, J.**

This matter is before us on appeal by a defendant from a trial court judgment awarding damages to plaintiff under the theory of detrimental reliance. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, Ronnie Marshall was looking for a building to renovate for use as a bar and restaurant. He approached his lifelong friend, Charles Franklin, about purchasing land and a building located at 64492 Highway 3081 in Pearl River, Louisiana (the property) that was previously a laundromat. Charles and Milton Marshall, Ronnie's cousin and friend, agreed to each put up one half of the money necessary to purchase the property. On August 23, 2018, Charles and Milton purchased the property located at 64492 Highway 3081 in Pearl River for the full sum of $100,000.00. After the defendants purchased the property, Ronnie began to clean out, repair, and renovate the building for use as a bar and restaurant. Ronnie also hired Thomas Pittman to prepare plans for the property and submit the plans to the Fire Marshall's Office for approval. Unfortunately, after the renovation had begun, Charles and Ronnie had a falling out over a female, and their relationship soured. Subsequently, Ronnie stopped working on the property. On April 23, 2019, Charles and Milton sold the property for $135,000.00.

On July 23, 2019, Ronnie filed a "Petition to Recover Damages for Breach of Contract, Detrimental Reliance and/or Unjust Enrichment," naming Charles and Milton as defendants and contending that he entered into a verbal contract with the defendants whereby it was agreed that he would clean out, repair, and renovate the property for use as a bar and restaurant, and once the property was renovated the defendants would enter into a formal written lease/purchase contract to sell the property to him. Ronnie contended that he invested a large amount of time, energy, and labor in reliance on the parties' verbal agreement and contract. In his petition,

2

he listed his expenditures totaling $25,389.94 and estimated his labor value to be $4,500.00.

Charles answered Ronnie's suit and filed a reconventional demand contending that Ronnie agreed that, after the property was purchased, he would lease the property from the defendants for $1,500.00 a month, and the parties would negotiate a long-term commercial lease once the bar was ready to open. He contended that Ronnie never paid the agreed-upon rent. Charles also contended that Ronnie took items from the property, including air conditioner units and washers and dyers, and damaged the building. Charles requested $48,000.00 for unpaid rent, missing items, and damage to the property.

Milton did not file an answer to Ronnie's suit, and a preliminary default was entered against Milton on November 7, 2019. On March 9, 2020, a judgment was signed confirming the preliminary default and rendering judgment in favor of Ronnie and against Milton in the amount of $29,889.94.[1]

On June 29, 2022, Ronnie's petition and Charles's reconventional demand came before the trial court for a trial. After the trial, the trial court signed a judgment on August 19, 2022, finding that Ronnie was owed, under the theory of detrimental reliance on the promise of Charles, reimbursement for his expenditures and labor in the amount of $27,489.68 and that Charles was solidarily liable with Milton for that amount.[2]

It is from this judgment that Charles appeals, contending that the trial court erred as a matter of law by finding that Ronnie relied to his detriment on unwritten

---

[1] This amount included $25,389.94 for reimbursement of out of pocket expenditures made by Ronnie plus $4,500.00 for Ronnie's uncompensated labor. Milton filed a motion for new trial, but the motion was denied.

[2] During the trial, it was revealed that Mr. Pittman overcharged Ronnie in the amount of $2,400.00. Therefore, the $29,889.68 in the judgment against Milton was reduced to $27,489.68. Mr. Pittman agreed that he would reimburse Ronnie for that amount. We note that the default judgment against Milton was in the amount of $29,889.94, and the judgment against Charles states it was in the amount of $29,889.68. We could not determine why those numbers were different, but we considered the amount in the judgment on appeal.

3

promises made by Charles and erred as a matter of law by denying Charles's reconventional demand.

## LAW AND ANALYSIS

The theory of detrimental reliance is codified at La. Civ. Code art. 1967, which pertinently provides, "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." A party claiming detrimental reliance must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. **Suire v. Lafayette City-Parish Consolidated Government**, 2004-1459 (La. 4/12/05), 907 So.2d 37, 59. Stated another way, a party must prove that: (1) the defendant made a promise to the plaintiff; (2) the defendant knew or should have known that the promise would induce the plaintiff to rely on it to his detriment; (3) the plaintiff relied on the promise to his detriment; (4) the plaintiff was reasonable in relying on the promise; and (5) the plaintiff suffered damages as a result of the reliance. **McLin v. HI HO, Inc.**, 2013-0036 (La. App. 1st Cir. 6/7/13), 119 So.3d 830, 833.

A theoretical debate exists as to whether detrimental reliance is an element of contracts or a separate source of obligations. A strong argument has been made that detrimental reliance is more correctly considered a tort theory than a contract theory. Whenever a party argues detrimental reliance, they do so because the promise lacked something essential to forming a "regular" contract. Detrimental reliance is simply not based upon one's intent to be bound (the basis of contract). The purpose of the doctrine of detrimental reliance is to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. **Suire**, 907 So.2d at 59. Detrimental reliance is an equitable rule inserted in our Civil Code,

4

which must be construed in conjunction with the rules of contracts. Jon C. Adcock, *Detrimental Reliance*, 45 La. L. Rev. 753, 761 (1985).

Appellate courts review a trial court's factual findings under the manifest error/clearly wrong standard of review. **Hall v. Folger Coffee Co.**, 2003-1734 (La. 4/14/04), 874 So.2d 90, 98. When factual findings are based upon determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings. **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. **Evans v. Lungrin**, 97-0541 (La. 2/6/98), 708 So.2d 731, 735.

During the hearing, several witnesses testified, including Ronnie and Charles. Ronnie testified that he, Charles, and Milton had been best friends all of their lives, and that he borrowed money from Charles on multiple occasions sometimes with a written agreement and sometimes without without a written agreement. He said Charles and Milton agreed to purchase the property for him to renovate and open a bar and restaurant. Ronnie testified that after the defendants purchased the property, he began clearing out and working on the property. According to Ronnie, Charles was often present when he was working on the property. Ronnie provided the court with receipts for the items he purchased in the process of clearing and renovating the property.

Ronnie testified that once the property was renovated and the businesses were open and running, the parties were going to sit down and prepare a lease purchase agreement. He stated that there was never an agreement for him to pay rent, but he agreed to pay the interest Milton and Charles would have received if their money

was in the bank. Ronnie said that once Charles started seeing Ronnie's girlfriend, "everything went haywire."

Charles also testified that he and Ronnie had a long friendship and that he had loaned money to him on several occasions. He acknowledged that he agreed to purchase the property because Ronnie wanted to open a bar, but testified that the parties agreed Ronnie would pay $1,500.00 a month in rent until Ronnie could get the property renovated. Charles said he had no knowledge of a deal for Ronnie to pay only the interest on their money. He testified that the parties did not execute a formal lease because, "I guess the same reason why [Ronnie] didn't protect his money that he invested in it. Because I trusted him like he trusted me." He said he handed Ronnie the keys to the building after he purchased it, and Ronnie went in there and gutted it.

Thomas Pittman, the engineer Ronnie hired to provide plans for the building, testified that he submitted plans to the Fire Marshall's Office, but while the review was pending, Ronnie called him and said that the building was sold. Mr. Pittman's invoices to Ronnie were introduced into the record. During cross examination, Mr. Pittman acknowledged that he double charged Ronnie for a bill from the Fire Marshall's Office.

Ellen Lewis, Charles's former girlfriend, testified that she was around the property for about six weeks after it was purchased. She said it was in deplorable condition, and Ronnie was there every day clearing out the building. She said they were all excited about the idea of opening a bar, and Charles was there with Ronnie working on the project. She testified that she never heard Charles and Ronnie discuss any rent.

Tim Landry, who was involved with the property before the defendants purchased it, testified that the property was derelict, and none of the washing

machines left were of any value. Further, Tim said he did not think that they air conditioning units worked anymore.

Erin Adams, who dated both Ronnie and Charles, testified that the incident that caused the "falling out" between Ronnie and Charles happened in November of 2018. She said she was aware that Ronnie was working on the building to build a bar. She said she never heard Ronnie and Charles discuss rent.

After listening to the testimony of the witnesses and considering the evidence presented, the trial court provided well-considered written reasons for his decision to find Ronnie detrimentally relied on a promise made by Charles. The trial court stated:

> It is clear that [Ronnie] entered into an oral agreement with [Charles], his lifelong friend, and that defendants would purchase the property and allow [Ronnie] to begin renovations and change the buildings into an operable bar room. Once the renovations were complete, it was the parties' intention to enter into a formal lease to own agreement. The parties had a falling out and the defendants sold the building for a profit of $35,000. [Ronnie] was left uncompensated for his out-of-pocket expenses related to the renovations and for his labor.

In considering Charles' reconventional demand, the trial court also concluded that Charles failed to establish that the parties entered into a lease because there was no evidence presented, other than Charles's own testimony, that the parties agreed for Ronnie to pay $1,500.00 a month in a month-to-month lease agreement. The trial court further determined that Charles failed to establish that the building contained anything of value or that Ronnie reduced the value of the building. The trial court's factual findings were heavily based upon determinations regarding the credibility of witnesses, and were supported by the evidence.

Considering the factual findings made by the trial court, we agree that Ronnie met his burden of proving by a preponderance of the evidence the factors laid out in **McLin** 119 So.3d at 833: (1) Ronnie and Charles were lifelong friends, and Charles agreed to purchase the property for Ronnie to renovate, and immediately gave

7

Ronnie the keys to begin renovating the property into a bar and restaurant; (2) Charles knew Ronnie was relying on their agreement as he watched him begin to renovate the property and was often around as Ronnie was spending his time and money to renovate the building; (3) Ronnie relied on their agreement as he began using his own time and money to renovate the building and have plans drawn to renovate the building; (4) Ronnie was reasonable in relying on Charles's promise based on their long history of loaning and borrowing money and friendship; and (5) Ronnie spent time and money in reliance on their agreement and was left uncompensated for his time and money spent in furtherance of the parties' plan to open a bar and restaurant.

We further discuss factor four as Charles argued in his brief that it was not reasonable for Ronnie to rely on an oral promise to sell the immovable property because La. Civ. Code art. 2440 requires a promise to sell immovable property to be in writing. In support of his argument, Charles cites **East Tangipahoa Dev. Co., LLC. In East Tangipahoa Dev. Co., LLC**, relying on **John W. Stone Oil Distributor, L.L.C. v. River Oaks Contractor & Developers, Inc.**, 2007-1001 (La. App. 5th Cir. 5/27/08), 986 So.2d 103, 108-109, writ denied, 2008-1397 (La. 9/26/08), 992 So.2d 992[3] this court held that it was not reasonable for the principal of East Tangipahoa Development, a businessman and attorney, to rely on an alleged oral agreement where an agreement to repurchase immovable property had to be in writing. **East Tangipahoa Dev. Co., LLC v. Bedico Junction, LLC**, 2008-1262

---

[3] In that case, the plaintiff business was interested in purchasing land for future expansion of its facilities, and the business allegedly orally agreed with defendants that defendants would purchase the entire tract of land and then sell a portion of the land to the plaintiff business. In affirming an award of summary judgment in favor of defendants, the court concluded that defendants were entitled to summary judgment dismissing plaintiff's claim pursuant to La. Civ. Code. art. 1967 because "it is not reasonable for a sophisticated businessman such as [the principal of the plaintiff business] to rely on an oral contract to sell immovable property given the firmly rooted statutory law and jurisprudence requiring such agreements to be in writing." **John W. Stone Oil Distributor, L.L.C.**, 986 So.2d at 105, 108-109.

(La. App. 1st Cir. 12/23/08), 5 So.3d 238, 247, <u>writ denied</u>, (La. 3/27/09), 5 So.3d 146.

During the trial, the trial court sustained an objection made by Charles's attorney, ruling that any attempt to establish if there was an oral agreement to purchase immovable property was not admissible, but testimony regarding if the parties had an oral agreement for the renovation of the property was admissible. The trial court was mindful of the law regarding detrimental reliance and the requirement for a writing for the sale or promise of sale of immovable property, and the trial court concluded that it was not unreasonable for Ronnie to rely on the promise made by Charles. We agree. Based on the parties' history, actions, and representations, it was not unreasonable for Ronnie to rely on the representations made by the defendants when he began using his time and money to start the renovation process. Particularly considering that immediately after the property was purchased, the defendants gave Ronnie the keys so that he could access the building and begin the renovation process, and they were frequently present as he worked on the building. Furthermore, unlike cases cited by Charles, which involved businesses and development companies, this promise was between lifelong friends who trusted each other and had a long history of borrowing and loaning money.

Charles also argued that Ronnie should not be allowed to recover under the doctrine of unclean hands because he did not pay the defendants rent or interest. The equitable doctrine of clean hands, sometimes referred to as "unclean hands," mandates that "[h]e who comes into a court of equity must come with clean hands." **Cimarex Energy Co. v. Mauboules**, 2009-1170 (La. 4/9/10), 40 So.3d 931, 945 (quoting **City of New Orleans v. Levy**, 233 La. 844, 865, 98 So.2d 210, 218 (1957)). A party has "unclean hands" if he engaged in reprehensible conduct, an illegal or immoral act, or a course of conduct naturally calculated, if not deliberately intended, to cause the very conditions that led the other party to seek equitable relief. **H&E**

9

**Equipment Services, Inc. v. Sugar & Power International, LLC**, 2016-1070 (La. App. 1st Cir. 2/17/17), 215 So.3d 446, 450. The trial court determined that Charles did not prove the parties had a lease agreement. Furthermore, Ronnie not paying the interest on the defendants' money does not rise to the level of an *illegal or immoral act* that would support the application of the doctrine of clean hands. Therefore, we find no merit to this argument.

After consideration of the evidence and assignments of error raised by Charles, we find no manifest error in the trial court's June 29, 2022 judgment.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. All costs of these proceedings are assessed to defendant-appellant, Charles Franklin.

**AFFIRMED.**